UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

**Edward Williams,**

    **Plaintiff,**

    **v.**

**Northeastern Illinois University,** *et al.*,

    **Defendants.**

## COMPLAINT

Plaintiff, Edward Williams, by and through his attorney, T. Andrew Horvat of Horvat Law, LLC, brings this action pursuant to 42 U.S.C. § 1983 for violations of Mr. Williams' due process rights and related claims in violation of federal and Illinois law. In support thereof, Mr. Williams asserts as follows:

### Jurisdiction and Venue

1. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 as Plaintiff seeks redress for Defendants' violation of federal law.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. 1367.

3. Venue is proper pursuant to 28 U.S.C. U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

### Parties

4. Edward Williams ("Plaintiff" or "Mr. Williams") is the Plaintiff in the above-entitled

1

matter. Mr. Williams is a former graduate student at Northeastern Illinois University's Daniel L. Goodwin College of Education who at all relevant times resided in Cook County, IL.

5. Northeastern Illinois University ("NEIU" or "the University") is a defendant in above-entitled matter. NEIU is a public university located in Chicago, IL.

6. Thomas Philon is a defendant in the above-entitled matter. Mr. Philon was at all relevant times employed by NEIU as the Dean of NEIU's Daniel L. Goodwin College of Education.

7. Alberto Lopez- Carrasquillo is a defendant in the above-entitled matter. Mr. Lopez-Carrasquillo was at all relevant times employed by NEIU as the Associate Dean of NEIU's Daniel L. Goodwin College of Education.

8. Catherine Wycoff is a defendant in the above-entitled matter. Ms. Wycoff was at all relevant times employed by NEIU as the Director of the Clinical Experiences and Student Teaching Office of NEIU's Daniel L. Goodwin College of Education.

9. Katy Smith is a defendant in the above-entitled matter. Ms. Smith was at all relevant times employed by NEIU as a Department Chair in NEIU's Daniel L. Goodwin College of Education.

10. Huseyin Colak is a defendant in the above-entitled matter. Mr. Colak was at all relevant times employed by NEIU as an associate professor in NEIU's Daniel L. Goodwin College of Education.

**Facts**

11. NEIU is composed of numerous colleges and departments, including the Daniel L. Goodwin College of Education ("GCOE").

12. At all relevant times, the GCOE offered more than twenty-five (25) programs, majors, and certificates in the field of education, including the Master of Arts in Teaching – Secondary Education Program ("MAT program").

13. In August of 2021, Mr. Williams was accepted into the MAT program. *See* Ex. A, Acceptance Letter.

14. In exchange for paying tuition to NEIU, NEIU agreed to confer a master's degree in secondary education to Mr. Williams upon his completion of the degree's requirements.

15. In addition, and in consideration for tuition paid to NEIU, the University and its employees agreed to abide by the rules and procedures promulgated and outlined in its Student Code of Conduct ("Code") contained in NEIU's Student Handbook, as well as its "Professional Standards for Students' Academic and Non-Academic Performance and Behavior" contained in the GCOE handbook ("GCOE handbook").

16. At all relevant times, NEIU and the GCOE provided a robust and multi-layered system of procedural due process to its students before it could take disciplinary action.

17. Mr. Williams, a straight-A student with no history of disciplinary issues, brings this lawsuit to remedy numerous violations of state and federal law, including the Defendants' refusal to provide him the copious amounts of due process promised him before arbitrarily expelling him from the MAT program.

**The NEIU Student Code of Conduct.**

18. The Code, contained in the NEIU Student Handbook, was at all relevant times applicable to all NEIU students, including those in the MAT program. *See* Ex. B, NEIU Student Code of Conduct.

19. Outlining the conduct and policies students must adhere to, and the procedures required before the University can take disciplinary action, the Code mandates that "[a]ll students shall enjoy certain rights, privileges, and opportunities by virtue of being members of the Northeastern Illinois University community, and all students shall be expected to make a commitment to further the mission and uphold the values of the University."

20. Among the rights and privileges conferred to NEIU students, including those in the MAT program, is the right to procedural due process.

21. To that end, the Code mandates that "[t]he University Student Code of Conduct is administered as a University procedure to process potential violations of misconduct and is distinct from criminal or civil litigation. Students alleged to have violated any provision of the Student Code of Conduct have the right to procedural due process."

22. The University's Code does not permit the University to take disciplinary action against a student arbitrarily or otherwise in the absence of good cause.

23. Instead, the Code lists nineteen (19) non-exhaustive instances in which a student may be disciplined for non-academic conduct.

24. The Code requires that before discipline can be taken against a student, a conduct hearing must occur. To that end, the Code states that "[a]ny student who violates the University's rules, policies, and regulations will be subject to a conduct hearing."

25. The conduct hearing is triggered by a "Misconduct Report" that is required to be submitted to the Student Affairs Office. Once submitted, the alleged violation must be "redressed by the procedures outlined within the University Code of Conduct as outlined below."

26. Once a Misconduct Report has been initiated, the Code provides NEIU students extensive process and temporal guidelines for that process to occur, including the rights to:

   a. an "initial conference" during which University personnel will: 1) inform the student of the violation; 2) make certain the student understands his or her rights and responsibilities under the Code; 3) make certain the student understands the disciplinary process; and 4) allow the student an opportunity to take responsibility for his or her actions, or otherwise dispute the allegation;

   b. if the allegation is not resolved at the initial conference, an" Administrative Hearing"

4

      conducted by the Assistant Dean of Students or, in the alternative and per the student's choice, a "Student Conduct Hearing Panel" conducted by three NEIU students;

c. at either the Administrative Hearing and Student Conduct Hearing Panel, the opportunity for the student to be assisted by an advisor who may advise and assist in asking questions, the right to a list of witnesses and the substance of their anticipated testimony, the right to call witnesses, the right to cross-examine witnesses, and the right to give opening and closing statements;

d. the right to be free from discipline absent a finding that it is "more likely than not" the student violated the Code; and

e. the right to appeal.

27. If found "more likely than not" to have engaged in non-academic misconduct, the Code sets out a series of "Misconduct Sanctions" including an official warning, educational sanctions, misconduct probation, suspension, and expulsion.

28. The Defendants failed to provide Mr. Williams any of the aforementioned process guaranteed by the Code, either before or after his expulsion from the MAT program.

29. In addition to failing to provide the process specifically promised by the Code, the Defendants failed to provide Mr. Williams pre or post-deprivation process of *any kind*, including complete and accurate notice of the allegations against him, the right to speak on his own behalf, view the evidence against him, call witnesses on his behalf, or question witnesses brought against him.

**The Goodwin College of Education Student Handbook.**

30. In addition to the Code, the GCOE maintains its own separate student handbook outlining student rights and disciplinary procedures for students in the GCOE. *See* Ex. C, GCOE Student

Handbook.

31. Despite maintaining its own handbook, the GCOE handbook and the Code are not mutually exclusive.

32. Instead, the GCOE handbook incorporates the Code by reference numerous times throughout, specifically noting that the GCOE handbook's procedures were "developed in line with" the Student Handbook and its Code, and further instructing students to "abide by all policies and procedures contained in the …. Student Handbook, which cover academic non-academic performance and behavior."

33. Like the Code, the GCOE handbook forbids the University and its GCOE from taking disciplinary action against a student absent good cause.

34. Instead, and in addition to the Code's nineteen (19) examples of non-academic misconduct that students must avoid, the GCOE's handbook lists an additional eleven (11) "Non-Academic Standards of Behavior" that GCOE students must adhere to or be subject to discipline.

35. To enforce the GCOE Non-Academic Standards of Behavior, the GCOE handbook provides for a process to monitor and sanction student behavior entitled the "Professional Standards Committee Process."

36. In the accordance with the "Professional Standards Committee Process," the GCOE, in addition to the process mandated by the Code, provides that the following process and student rights are applicable to allegations of non-academic misconduct:

   a. confidentiality throughout the process;

   b. the right of the student to meet with GCOE faculty to discuss the allegation, clarify the expectations of the University, and, if necessary, provide a remediation plan for the student to follow;

   c. that in the event the remediation plan fails, a report/evaluation will be made to the

      Department Chair;

d. that upon receipt of the evaluation, the Department Chair will refer the matter to the Department's Professional Standards Committee ("PSC") requesting that the PSC Chair convene a PSC meeting;

e. that the Department Chair inform the student of the incident/allegation and PSC referral in writing, and will further inform the student of purpose of the PSC, the PSC procedure, and the student's rights and responsibilities during the process;

f. the PSC will then conduct an investigation, which may include interviews, and render a written recommendation to the Department Chair which may include a remediation plan;

g. upon receipt of the PSC recommendation, the Department Chair will render a decision regarding the "status and standing" of the student within the program in writing;

h. a right to appeal the Department Chair's decision to the Dean of the GCOE.

37. As with their failure to provide the process promised to Mr. Williams in accordance with the Code, the Defendants likewise failed to provide Mr. Williams any of the aforementioned process provided by the GCOE handbook, either before or after his expulsion from the MAT program.

38. In addition to failing to provide the process specifically promised by the GCOE handbook, the Defendants failed to provide Mr. Williams pre or post-deprivation process of *any kind*, including complete and accurate notice of the allegations against him, the right to speak on his own behalf, view the evidence against him, call witnesses on his behalf, or question witnesses brought against him.

**Additional Process for Terminated Placements.**

39. In addition to the Code and the "Professional Standards Committee Process" applicable to all GCOE students, the GCOE handbook also provides additional procedural process for GCOE students whose performance while student-teaching is lacking, or for those students whose student-teaching placement has been terminated.

40. Like the Code and other general sections of the GCOE handbook, the specific section of the GCOE handbook dedicated to student-teachers forbids the University and the GCOE from taking disciplinary action against a student in the absence of good cause.

41. To that end, this specific section of the GCOE handbook, entitled "Terminated Placements," provides for twenty-two non-exhaustive instances of non-academic conduct deemed serious enough to remove a student-teacher from his or her student-teaching placement (i.e. school).

42. To assist the student and University in addressing non-academic conduct occurring during the student-teacher's placement, the GCOE handbook provides an "Action Plan for Professional Improvement."

43. In the accordance with the "Action Plan for Professional Improvement," the GCOE handbook, in addition to that provided in the Student Code and the GCOE's "Professional Standards Committee Process," provides that the following process and student rights are applicable to allegations of non-academic misconduct:

   a. when a student-teacher's performance is lacking, or their placement has been terminated, a "Candidate Alert" form is to be submitted to the Department Chair and the Clinical Experience and Student Teaching ("CEST") office;

   b. once submitted, the "Candidate Alert Meeting" is to be scheduled and held at which time the substance of the allegations will be discussed with the student;

8

    c. if, after the meeting is completed, the student-teaching candidate is allowed to continue in their placement, an "Action Plan" will be formulated to assist and remediate the alleged violation;

    d. if, instead, at the conclusion of the Candidate Alert Meeting the student-teacher is not allowed to resume his or her placement, the student-teacher will be referred to the department's PSC committee where they will be subjected to the "Professional Standards Committee Process" outlined in GCOE handbook;

    e. if, however, the University determines that the "deficiencies in knowledge, skills, or disposition" of the student-teacher are "so severe or beyond remediation," then the University may refer the student-teacher to the PSC committee in tandem with submitting a Candidate Alert or, in the alternative, refer the student-teacher directly to the department's PSC committee in lieu of initiating a Candidate Alert and convening a Candidate Alert Meeting.

44. As with their failure to provide the process promised by the Code and the GCOE's "Professional Standards Committee Process," the Defendants likewise failed to provide Mr. Williams any of the aforementioned process provided by the "Terminated Placements" portion of the GCOE handbook, either before or after his expulsion from the MAT program.

45. In addition to failing to provide the process specifically promised by the "Terminated Placements" portion of the GCOE handbook, the Defendants failed to provide Mr. Williams pre or post-deprivation process of *any kind*, including complete and accurate notice of the allegations against him, the right to speak on his own behalf, view the evidence against him, call witnesses on his behalf, or question witnesses brought against him.

**Mr. Williams begins his Student-Teaching Placement.**

46. Mr. Williams began his student-teaching placement in January of 2023 at Ridgewood

High School in Norridge, IL, a school that commonly accepted NEIU student-teachers from the GCOE program.

47. As of the start of the Spring semester in January of 2023, Mr. Williams had earned 25 credit hours towards the 37 credit hours needed for graduation, with a sterling overall cumulative GPA of 4.0 on a 4.0 scale.

48. Although grateful for the opportunity provided by Ridgewood High School, Mr. Williams' time at Ridgewood was not without difficulties due to a failure in the leadership by supervising faculty at both the GCOE and Ridgewood High School.

49. To that end, Mr. Williams, against his wishes and contrary to the rules and expectation of both Ridgewood High School and the GCOE, was often placed in unsupervised roles without direction, was required to provide emotional and social support to students without adequate training, was given assignments beyond his required duties as a student-teacher, and was made to work hours that exceeded the expectations of his student-teaching placement.

50. Despite these obstacles, Mr. Williams performed in an exemplary fashion, maintained an excellent rapport with the Ridgewood High School students, and was even offered a job by Ridgewood High School faculty.

51. At the conclusion of the Spring semester, Mr. Williams would have been certified to teach in Illinois as he had already passed the content exam with Illinois State Board of Education.

52. As a result, Mr. Williams would have been eligible for hire as a full-time teacher in Illinois at the conclusion of the 2023 Spring semester with only three more credits to earn to obtain his Master's of Art in Teaching degree.

**The April 4, 2023, Incident**.

53. Prior to April 4, 2023, Mr. Williams had taught a student who was going through

emotional difficulties and had therefore sought guidance from Mr. Williams.

54. Despite several attempts to obtain support for the student, Ridgewood faculty failed to address Mr. Williams' requests to assist the student.

55. On April 4, 2023, a severe hailstorm passed through the Norridge, IL area causing Ridgewood High School to close for safety reasons.

56. As Mr. Williams was leaving the school at the conclusion of the school day, the student advised Mr. Williams that he was scared to walk home due to the storm. In response, Mr. Williams agreed to give the student a ride to his home located a short distance away.

57. At no time during April 4, 2023, ride, or at any time before, did Mr. Williams engage in any untoward conduct with this student, nor has such an allegation ever been made.

58. Despite the innocent nature of the relationship, and the compassionate gesture shown to the student on April 4th, Mr. Williams's act of giving the student a ride during a severe weather event was reported as a rules violation to GCOE and Ridgewood High School supervising faculty.

59. What would ensue shortly thereafter was a rushed and blatant violation of Mr. Williams' rights.

**The University Expels Mr. Williams from the MAT Program without Process.**

60. The following day, on April 5th, Mr. Williams received an email asking that he meet with GCOE faculty on April 6th regarding his student-teaching placement.

61. On April 6, 2023, a meeting was held at NEIU to discuss Mr. Williams' standing in the MAT program.

62. Present at the meeting were Defendants Lopez-Carrasquillo, Smith, Colak, and Wycoff.

63. Having been notified by Ridgewood High School on April 5th that his placement had been terminated, Mr. Williams went to the meeting with the understanding that he would be able to

give his side of the story, discuss how best to remediate the issue, and eventually continue in the MAT program. Nothing of the sort occurred.

64. Instead, immediately upon entering the meeting, Mr. Williams was told by Defendants Smith and Lopez- Carrasquillo that he was not allowed to speak and that the decision to expel him from the MAT program had already been made.

65. Not only was Mr. Williams instructed not to speak, but he was not informed of his rights, was not informed of the process provided in the Code and GCOE handbook, was not allowed to review any of the evidence against him, was not afforded an impartial tribunal, and was not even given the ability to accept or deny the allegations – allegations that were never fully explained.

66. The decision to expel Mr. Williams without any process was made by Defendants Lopez-Carrasquillo, Smith, Colak, and Wycoff.

67. Due to their positions in the GCOE, each Defendant was well aware of the process being denied Mr. Williams, was in a position to intervene and provide the process due, but failed to do.

68. Not only did the Defendants fail to intervene, but they agreed amongst themselves that no process would be provided to Mr. Williams either before or after his expulsion.

69. Sometime thereafter, unknown GCOE faculty informed Mr. Williams' peers in the GCOE of his expulsion in violation of University policy. From that point forward, Mr. Williams' peers in the GCOE shunned him.

70. Prior to this invasion of privacy, Mr. Williams enjoyed a collegial relationship with his MAT peers.

71. Approximately one week later, and without any further contact with University officials, Mr. Williams received a letter drafted by Defendant Smith confirming Mr. Williams' expulsion from the MAT program.

72. In Defendant Smith's letter, Defendant Smith, despite Mr. Williams expulsion, indicated

12

that the matter had been further referred to NEIU's Vice President of Student Affairs and Dean of Students "in regard to violation of the NEIU Student Code of Conduct."

73. Despite the alleged referral, and the extensive process guaranteed to NEIU students facing discipline for violations of the Code, no further process was provided to Mr. Williams.

74. On April 17, 2023, Mr. Williams' former counsel authored a letter directed to NEIU and the GCOE protesting Mr. Williams' expulsion and identifying the numerous procedural violations of the Code and GCOE handbook.

75. Shortly thereafter, Mr. Williams was informed by the University that it would "not be recognizing the letter" but that Mr. Williams would be given a chance to write an appeal letter with no further process to be provided.

76. On April 27, 2023, Mr. Williams authored an appeal emphasizing the lack of support and process given him and the devastating and irreparable consequences of Defendants' draconian penalty.

77. On May 10, 2023, Thomas Philon, Dean of the GCOE, authored a response to Mr. Williams denying his appeal.

78. In his letter, Defendant Philon provided an additional reason for Mr. Williams' expulsion; an allegation that Mr. Williams shared "social network information with students in the context of [teaching] lessons."

79. Defendant Philon's additional "social network sharing" basis for Mr. Williams' expulsion was the first time Mr. Williams had been informed that this purported reason factored in his expulsion.

80. Defendant Philon's reliance on "social network sharing" was a transparently pretextual attempt to excuse the complete lack of process afforded Mr. Williams and provided no opportunity for Mr. Williams to respond to this eleventh hour pretextual claim.

81. In fact, the conduct cited by Defendant Philon was previously approved and lauded by both Ridgewood High School and GCOE faculty as part of Mr. Williams' classroom instruction.

82. Defendant Philon, as the Dean of the GCOE, was well aware of the process being denied Mr. Williams, was in a position to intervene and provide the process required, but failed to do so.

83. Not only did Defendant Philon fail to intervene, but he agreed with Defendants Lopez-Carrasquillo, Smith, Colak, and Wycoff that no further process would be provided to Mr. Williams.

84. To date, Mr. Williams has been denied the opportunity to speak on his behalf, denied notice of his rights and the process due, denied the opportunity to review the evidence leading to his expulsion, denied an impartial tribunal, denied the right call witnesses on his behalf, denied the right to question witness who have provided evidence against him, and has been further denied the additional litany of due process explicitly promised to him in the Code and GCOE handbook.

**The Defendants' Action have Irreparably Harmed Mr. Williams.**

85. As a result of the Defendants' actions, Mr. Williams has suffered significant injury to his emotional well-being, his professional prospects, and his reputation.

86. With respect to his emotional well-being, Mr. Williams has suffered extreme embarrassment and emotional distress that has necessitated his use of mental health professionals and medication to ameliorate the harm done to him by the Defendants.

87. Moreover, Mr. Williams has suffered irreversible damage to his reputation and standing in the community. Through the actions of the Defendants, Mr. Williams has been ostracized by his peers who shunned him once advised by GCOE faculty of his expulsion.

88. Moreover, in applying to new schools to continue his education, Mr. Williams will be required to disclose his expulsion which will significantly, if not permanently, impede his ability

to continue his education.

89. In addition, Mr. Williams, should he find an educational institution willing to accept him, will have to further disclose his expulsion to the Illinois State Board of Education which will significantly risk his licensure as an Illinois teacher.

90. Moreover, and in addition to the permanent injury to his reputation and his educational and professional prospects, the Defendants' actions have denied Mr. Williams the opportunity to obtain a master's degree at the university of his choosing, have resulted in the loss of considerable sums of money in education and related expenses, will cost Mr. Williams additional money in lost credits upon transfer, and have delayed Mr. Williams' entry into the teaching profession.

## COUNT I
### Violation of Fourteenth Amendment Procedural Due Process
### Against all Defendants

91. Plaintiff incorporates each paragraph of this Complaint as fully stated herein.

92. As described more fully herein, Plaintiff possessed a property interest in his continued education absent good cause.

93. Defendants deprived Plaintiff of his interest without affording him adequate pre or post-deprivation process, or were otherwise in a position to intervene but failed to do so.

94. Defendants' actions were arbitrary, capricious, and undertaken in bad faith.

95. As a result of Defendants' conduct, Plaintiff has been injured.

## COUNT II
### Violation of the Fourteenth Amendment Procedural Due Process
### Against all Defendants

96. Plaintiff incorporates each paragraph of this Complaint as fully stated herein.

97. As described more fully herein, Plaintiff possessed a liberty interest in his good name,

reputation, honor, and integrity.

98. Defendants deprived Plaintiff of his interest without affording him adequate pre or post-deprivation process, or were otherwise in a position to intervene but failed to do so.

99. Defendants' action altered Plaintiff's legal status.

100. Defendants' actions were arbitrary, capricious, and undertaken in bad faith.

101. As a result of Defendants' actions, Plaintiff has been injured.

## COUNT IIII
### Conspiracy – Federal Law
### Against all Defendants

102. Plaintiff incorporates each paragraph of this Complaint as fully stated herein.

103. As described more fully herein, the Defendants, in concert with one another, conspired to violate Plaintiff's rights with each taking a substantial step in furthering the conspiracy.

104. Defendants' actions were arbitrary, capricious, and undertaken in bad faith.

105. As a result of Defendants' actions, Plaintiff has been injured.

## COUNT IV
### Breach of Written Contract
### Against all Defendants

106. Plaintiff incorporates each paragraph of this Complaint as fully stated herein.

107. As described more fully herein, Plaintiff and NEIU entered into a binding contract that NEIU, through the actions of the individual Defendants who substantially aided and assisted the University, materially breached by expelling Plaintiff from the MAT program.

108. Defendants' actions were arbitrary, capricious, and undertaken in bad faith.

109. As a result of Defendants' actions, Plaintiff has been injured.

## COUNT V
### Breach of Implied-in-Fact Contract
### Against all Defendants

110. Pleading in the alternative to the existence of a written contract, and as described more fully herein, the conduct of the parties gave rise to an implied-in-fact contract.

111. As described more fully herein, through the actions of the individual Defendants who substantially aided and assisted the University, NEIU materially breached the contract by dismissing Plaintiff from the MAT program.

112. Defendants' actions were arbitrary, capricious, and undertaken in bad faith.

113. As a result of Defendants' action, Plaintiff has been injured.

## COUNT VI
### Unjust Enrichment
### Against all Defendants

114. Pleading in the alternative to the existence of a contract, and as described more fully herein, by way of tuition, fees, and expenses paid to the University, the University, through the actions of the individual Defendants who substantially aided and assisted the University, has unjustly retained a monetary benefit to the Plaintiff's detriment.

115. Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

116. Defendants' actions were arbitrary, capricious, and undertaken in bad faith.

117. As a result of Defendants' actions, Plaintiff has been injured.

## COUNT VII
### Promissory Estoppel
### Against all Defendants

118. Pleading in the alternative to the existence of a contract, and as described more fully herein, Defendants made an unambiguous promise to Plaintiff to abide by its procedures

17

and policies and further act in good faith in their dealings with Plaintiff.

119. Plaintiff relied on that promise with said reliance being expected and foreseeable to Defendants.

120. Through the actions of the individual Defendants who substantially aided and assisted the University, the University broke its promise.

121. Defendants' actions were arbitrary, capricious, and undertaken in bad faith.

122. As a result of Defendants' actions, Plaintiff has been injured.

## COUNT VIII
### Intentional Infliction of Emotional Distress
### Against all Defendants

123. Plaintiff incorporates each paragraph of this Complaint as fully stated herein.

124. As described more fully herein, the Defendants, intending that their conduct would cause severe emotional distress, or knowing that there was a high probability that their conduct would cause severe emotional distress, engaged in conduct that caused severe emotional distress to Plaintiff.

125. Defendants' actions were arbitrary, capricious, and undertaken in bad faith.

126. As a result of Defendants' action, Plaintiff has been injured.

## COUNT IX
### Civil Conspiracy
### Against all Defendants

127. Plaintiff incorporates each paragraph of this Complaint as fully stated herein.

128. As described more fully herein, the Defendants, in concert with one another, conspired to violate Plaintiff's rights and in so doing each took a substantial step in furtherance of the conspiracy.

129. Defendants' actions were arbitrary, capricious, and undertaken in bad faith.

130. As a result of Defendants' action, Plaintiff has been injured.

## COUNT X
*Respondeat Superior*
**Against NEIU**

131. Plaintiff incorporates each paragraph of this Complaint as fully stated herein.

132. In the manner described above, the University employed each named Defendant and controlled, or had the right to control, the conduct of each named Defendant.

133. In the manner described above, each individual Defendant performed acts which violated the law and are directly chargeable to the University.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in his favor and against the Defendants, order the Plaintiff reinstated to the MAT program, expunge any reference in his records or transcripts of his expulsion, order Plaintiff the procedural due process he is entitled to, award compensatory damages, punitive damages, attorneys' fees, and costs, as well as any other relief this Court deems just.

## Jury Trial Demanded

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

*T. Andrew Horvat*
Attorney for Plaintiff

/s/ T. Andrew Horvat
Horvat Law, LLC
155 N. Wacker Drive, Suite 4250
Chicago, IL 60606
312-803-4956
andrew@horvatlawllc.com
ARDC No. 6277684